IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

ELIYAHU HALALI, a New Jersey resident,
RUSLANA HALALI, a New Jersey resident,
and ISAAC ARAKANCHI, a New York resident,

    Plaintiffs,

v.

1100 WEST INVESTMENTS, LLC, a Delaware limited
liability company, 1100 WEST CONDOMINIUM
ASSOCIATION, INC., a Florida not for profit corporation,
CIRILLINO, LLC, a Florida limited liability
company, and SHALAD REAL ESTATE CORP., a
Florida corporation,

    Defendants.
_____/

## COMPLAINT

Plaintiffs, ELIYAHU HALALI and RUSLANA HALALI (collectively "PLAINTIFF HALALI"), and Plaintiff, ISAAC ARAKANCHI ("PLAINTIFF ARAKANCHI"), all of whom are collectively referred to as the "PLAINTIFFS", pursuant to the Local Rules, Federal Rules of Civil Procedure and other applicable law, hereby file this Complaint and state as follows:

### JURISDICTION AND VENUE

    1.    This is an action in equity and at law.

    2.    PLAINTIFF ELI HALALI is *sui juris* and is a citizen of the State of New Jersey.

    3.    PLAINTIFF RUSLANA HALALI is *sui juris* and is a citizen of the State of New Jersey.

    4.    PLAINTIFF ARAKANCHI is *sui juris* and is a citizen of the State of New York.

5. DEFENDANT 1100 WEST INVESTMENTS, LLC ("1100 INVESTMENTS"), is a Delaware limited liability, and has its principal place of business in Miami-Dade County, Florida.

6. DEFENDANT 1100 WEST CONDOMINUM ASSOCIATION, INC. ("1100 CONDO"), is a Florida not for profit corporation, and has its principal place of business in Miami-Dade County, Florida.

7. DEFENDANT CIRILLINO, LLC ("CIRILLINO"), is a Florida limited liability company, and has its principal place of business in Miami-Dade County, Florida.

8. DEFENDANT SHALAD REAL ESTATE CORP. ("SHALAD"), is a Florida corporation, and has its principal place of business in Miami-Dade County, Florida.

9. 1100 INVESTMENTS and 1100 CONDO are referred to as the "1100 DEFENDANTS".

10. 1100 DEFENDANTS and CIRILLINO are collectively referred to as the "DEFENDANTS".

11. Complete diversity exists among PLAINTIFFS and DEFENDANTS.

12. The amount in controversy exceeds $75,000.

13. The acts giving rise to this action occurred in Miami-Dade County, Florida.

14. This Court has diversity and subject matter jurisdiction over this action.

15. Venue in this Court is proper.

16. DEFENDANTS regularly conduct business in the State of Florida, maintain minimum contacts with the State of Florida, and are registered to do business in the State of Florida.

17. DEFENDANTS have committed tortious acts in the State of Florida of which have damaged PLAINTIFFS.

18. All conditions precedent to this action have been satisfied and/or have been waived.

## FACTUAL ALLEGATIONS

19. The Mondrian South Beach ("Mondrian") is located at 1100 West Avenue, Miami Beach, Florida 33139. It is a luxury, mixed-use hotel and condominium. Its website describes the Mondrian as an "icon", as having recently undergone a "multi-million dollar property-wide renovation", and boasts a variety of high-end amenities and services.

20. 1100 CONDO is the condominium association at the Mondrian. In addition to the name Mondrian, the name 1100 West, a Condominium is also used at times. In this Complaint, the term "Mondrian" includes 1100 West, a Condominium.

21. 1100 INVESTMENTS essentially manages the Mondrian and asserts a great deal of control over 1100 CONDO. It is also believed that 1100 INVESTMENTS oversees the renting of the units and manages the hotel/rental functions at the Mondrian.

22. 1100 UNITS, LLC ("1100 UNITS") is intertwined with 1100 INVESTMENTS and other related companies. Upon information and belief, 1100 INVESTMENTS uses 1100 UNITS to purchase units at the Mondrian, rent units on the Mondrian, and directs 1100 CONDO to take actions on behalf of and for the benefit of 1100 UNITS (such as assisting 1100 UNITS purchase units at the Mondrian, etc.).

23. As part of the Mondrian's business structure, individuals and/or entities own units at the Mondrian, and then 1100 INVESTMENTS and 1100 CONDO control and manage the

renting of these units to the general public.  There are typically a variety of restrictions in place that prevent individual unit owners from using their property freely.  For example, unit owners are typically required to contact 1100 INVESTMENTS and/or 1100 CONDO to make reservations for their own use of their properties.

24. 1100 INVESTMENTS and 1100 CONDO are typically in charge of renting out the units.  This is usually accomplished through a Rental Management Agreement, Rental Participation Agreement, or other contract where it is agreed that 1100 INVESTMENTS, 1100 CONDO, and/or another entity rent out the units.  1100 CONDO typically acts at the direction of 1100 INVESTMENTS or one of its appointees/designees.

25. As part of this arrangement, 1100 INVESTMENTS and 1100 CONDO receive income from renting units, and the unit owners are supposed receive a portion of the rents generated.

26. As with many condominium associations, when a person is purchasing a unit, there are a variety of documents that must be submitted to the association and/or to the condominium's board of directors.

## PLAINTIFFS' PENDING PURCHASE OF UNITS 817 AND 617

27. CIRILLINO own units 817 and SHALAD owns unit 617 located in the Mondrian.

28. PLAINTIFF HALALI entered into a contract with CIRILLINO for the purchase of unit 817.  A copy of this contract ("Unit 817 Contract"), is attached hereto as **Exhibit "1"**.  To the extent there are additional addendums and/or supplements to the Unit 817 Contract, those documents are incorporated herein by reference.

29. The price for unit 817 was $275,000. The escrow deposit for the purchase that was paid by PLAINTIFF HALALI was $55,000.

30. PLAINTIFF ARAKANCHI entered into a contract with SHALAD for the purchase of unit 617. A copy of this contract ("Unit 617 Contract"), is attached hereto as **Exhibit "2"**. To the extent there are additional addendums and/or supplements to the Unit 617 Contract, those documents are incorporated herein by reference.

31. The price for unit 617 was also $275,000. The escrow deposit for the purchase that was paid by PLAINTIFF ARAKANCHI was $55,000.

## 1100 INVESTMENTS' FIRST RIGHT OF REFUSAL AND HOW IT IS WAIVED

32. The Declaration of Condominium for the Mondrian (which under the Declaration is referred to as 1100 West, a Condominium), is incorporated herein by reference. This document is also referred to as the "Declaration".

33. Under the Declaration, when a unit owner receives an offer to purchase its unit at the Mondrian, 1100 INVESTMENTS[1] has a right of first refusal over the sale, with several exceptions and limitations.

34. One of the exceptions is that once notice of the pending sale is received, 1100 INVESTMENTS has 30 days therefrom to exercise its right to purchase the unit. According to the Declaration, 1100 INVESTMENTS essentially steps into the shoes of the prospective buyer and agrees to pay the unit owner the price for which it already contracted to sell the unit.

---

[1] The Declaration references a "Hotel Unit Owner", who is the owner of Mondrian. Based on 1100 INVESTMENTS' actions and representations, it is assumed that it is the Hotel Unit Owner.

35. If 1100 INVESTMENTS fails to exercise this right within 30 days, then this right to purchase dissolves.

### 1100 INVESTMENTS AND 1100 CONDO REGULARLY CONDUCT SALES OF MONDRIAN UNITS VIA E-MAIL, *NOT* VIA CERTIFIED MAIL

36. The Declaration states that notice of unit sales is to be made via certified or registered mail. Upon information and belief though, such notice is almost always made via e-mail. This is done by providing e-mail notice to 1100 CONDO, and then 1100 CONDO e-mails the information to 1100 INVESTMENTS. This is because 1100 INVESTMENTS essentially controls 1100 CONDO, and 1100 CONDO often acts as 1100 INVESTMNENTS' appointee and/or designee.

37. Upon information and belief, there have been numerous units in the Mondrian for sale over the years, and little to none of these sales follow the certified mail procedure set forth in Declaration.

38. This provision is neither enforced/followed by 1100 INVESTMENTS nor by 1100 CONDO.

39. To this point, 1100 INVESTMENTS regularly receives notice of sales via e-mail, responds to the notices via e-mail, and this is how business is done. Upon information and belief, 1100 INVESTMENTS has exercised and/or attempted to exercise its first right of refusal via e-mail on a multitude of occasions as well.

40. E-mail notice has been used so frequently that it establishes a clear course of conduct, course of performance, and/or trade usage where the certified/registered mail section of the Declaration is not used, and that e-mail is the acceptable and preferred means of carrying out 1100 INVESTMENTS' and 1100 CONDO's business.

41. Unfortunately, 1100 INVESTMENTS and 1100 CONDO are now trying to use this certified mail provision as a shield and a sword.

## 1100 INVESTMENTS RECEIVES AND ACCEPTS E-MAIL NOTICE OF THE SALES OF UNITS 817 AND 617

42. On or before December 19, 2020 the Unit 817 Sales Contract, along with other related sales documents, was submitted to 1100 CONDO. 1100 CONDO received this information **via e-mail**. Also on or before December 19, 1100 CONDO **e-mailed** this information to 1100 INVESTMENTS.

43. On or before December 19, 2020, the Unit 617 Sales Contract, along with other related sales documents, was submitted to 1100 CONDO. 1100 CONDO received this information **via e-mail**. Also on or before December 19, 1100 CONDO **e-mailed** this information to 1100 INVESTMENTS.

44. Also **via e-mail**, 1100 CONDO confirmed that it had received all of these documents and that it had forwarded them 1100 INVESTMENTS for their review.

45. In particular, **via email** 1100 CONDO wrote, "I have forwarded everything to 1100 West Investments for review. Please note that it can take up to 30 days to get a response."[2]

46. In another **e-mail**, prior to December 19, 1100 CONDO wrote, "Please note I have not received the sales contract for those units. **There is a right of first refusal and the contracts and addendums have to be submitted to me so I can forward to the Hotel**. It can take up to

---

[2] PLAINTIFFS have multiple **e-mails** that support its position. As this is a Complaint, such documents are not attached to this pleading, but they are referenced so as to allege PLAINTIFFS' claims with particularity and to provide context.

30 days to give an answer.  Also, please make sure to disclose the status of the Hotel contract with the buyer(s)."

47. There is no reference to any certified mail/registered mail requirement.  Much to the contrary 1100 CONDO makes it crystal clear that pending sales contracts for Mondrian units are to be **e-mailed** to 11000 CONDO, that 1100 CONDO then **e-mails** this information to 1100 INVESTMENTS, and that this is what starts running the 30 days in which 1100 INVESTMENTS can exercise its right to purchase pending Mondrian units, in this case units 817 and 617.

48. The only reasonable inference to be drawn from this procedure is that 1100 CONDO is acting at the direction of 1100 INVESTMENTS, and that this is how 1100 CONDO and 1100 INVESTMENTS conduct business, especially Mondrian unit sales.

49. In yet another **e-mail**, a representative for the sellers of units 817 and 617, CIRILLINO and SHALAD, respectively, informed PLAINTIFFS' representative that 1100 CONDO "confirmed last night that [it] has all [it] needs for these waivers and has already submitted them for both units to 1100 West Investments to get the clock started on the 30 days."

50. This further demonstrates that 1100 CONDO is the conduit for providing notice to 1100 INVESTMENTS via **e-mail**, that 1100 CONDO was working hand-in-hand with the parties to move the sales process along.

### 1100 INVESTMENTS MISSES THE 30-DAY DEADLINE AND LOSES ITS RIGHT TO PURCHASE UNITS 817 AND 617

51. On December 19, 2020, 1100 INVESTMENTS received notice of the pending sales of units 817 and 617.  Thus, it had 30 days therefrom, until January 18, 2021, to exercise its right to purchase units 817 and 617.

52. 1100 INVESTMENTS failed to exercise its rights of first refusal for units 817 and 617 within the 30-day window. As such, it lost these rights.

53. Despite missing this 30-day window, 1100 INVESTMENTS took the position that it can still exercise its right of first refusal for units 817 and 617. It attempted to do this by sending **e-mails** on January 20, 2021 (2 days *after* the 30-day deadline) stating that it would be purchasing the units. As this was beyond the deadline, 1100 INVESTMENTS had no rights to exercise.

54. Likely recognizing the untimeliness of its claim, 1100 INVESTMENTS attached backdated letters to the emails,[3] showing the letters dated as January 15, 2021. This was done because if 1100 INVESTMENTS had asserted its right on January 15, then it likely could have purchased the units.

55. This underhanded move was quickly noticed by PLAINTIFFS. PLAINTIFFS then informed 1100 INVESTMENTS of their apparent fraud (the backdating of the letters), and that 1100 INVESTMENTS had lost their right to purchase the units as consequence of missing the deadline. As such, PLAINTIFFS planned to move forward with their purchase of the units.

56. Upon information and belief, the sellers of the units, CIRILLINO and SHALAD, agreed with PLAINTIFFS' position.

57. Notably, 1100 INVESTMENTS' first backdated letters never raised any issue of certified/registered mail. This is because, as detailed above, 1100 INVESTMENTS and 1100 CONDO's course of conduct, course of performance, and trade usage was to use **e-mail** to carry out Mondrian unit sales and to exercise their right to purchase units.

---

[3] Such an act is clearly futile as the e-mails state the date and time they were sent, and these dates and times were beyond the 30-day window.

58.  Undeterred by PLAINTIFFS' recognition of its waiver of rights, 1100 INVESTMENTS continued its egregious conduct.  On January 25, 2021 (now 7 days beyond the 30-day deadline), it sent more **emails** with more backdated letters.

59.  1100 INVESTMENTS' second batch of backdated letters took the newly minted position that because it did not receive notice of the pending sales of the units via certified/registered mail, that they had technically not received notice at all, and therefore could still exercise their right to purchase the units.  This argument again fails.

60.  Notably, it made this assertion and attempt to exercise its rights via **e-mail**.  This is a prime example of 1100 INVESTMENTS trying to use the certified mail provision as a shield and a sword.  1100 INVESTMENTS regularly and consistently uses **e-mail** to receive notice of sales, to order 1100 CONDO to be the point person to receive initial notice of the sales and then forward it to 1100 INVESTMENTS, and informs unit owners/potential buyers of units/1100 CONDO of its decision to exercise its right of first refusal.  Despite the foregoing and its established course of conduct/course of performance/trade usage regarding e-mail, 1100 INVESTMENTS cannot now claim that certain notices must be sent via certified mail.

61.  Additionally, while the Declaration references sending notice to the Hotel Unit Owner (which at this time is assumed to be 1100 INVESTMENTS) via certified mail, absent from the Declaration is an address to which to send such notice.  And as stated previously, the Hotel Unit Owner is believed to have changed over the years, and certainly since the Declaration was first executed.

62.  The point is that the notice address is not stated, and appears to be fluid.

63. The most logical way to resolve this issue, would be for the 1100 INVESTMENTS to appoint an entity/person to handle receiving notice on its behalf and/or of assisting 1100 INVESTMENTS in receiving such notice.

64. In fact, the Declaration provides for just this, by stating that 1100 INVESTMENTS can appoint such a person to assist with notice of Mondrian unit sales.

65. This is exactly the role 1100 CONDO plays. It receives the notice of Mondrian unit sales via **e-mail**, it communicates with the parties to the sales via **e-mail**, it sends notice of the sales to 1100 INVESTMENTS via **e-mail**, and it communicates on behalf of 1100 INVESTMNETS via **e-mail**. It plays this role because it has been appointed/directed by 1100 INVESTMNETS to do so. Thus, 1100 INVESTMENTS' receipt of the notice of the sales of units 817 and 617 via **e-mail** was valid, and it missed the 30-day deadline to purchase the units.

66. 1100 INVESTMENTS' and 1100 CONDO's actions have now derailed the sales of these units and have caused damage to PLAINTIFFS.

## **1100 INVESTMENTS AND 1100 CONDO'S UNLAWFUL RENTING OF THE UNITS**

67. Adding insult to injury, it is believed 1100 INVESTMENTS and 1100 CONDO have begun renting out units 817 and 617 to the general public, despite that these units should be sold to PLAINTIFF HALALI and PLAINTIFF ARAKANCHI, respectively. As such, any monies generated from 817 and 617 during the pendency of this lawsuit should be held in an attorney's trust account or held by the Court's registry.

68. To the extent CIRILLINO and/or SHALAD are receiving a portion of these rents, their portions should go to PLAINTIFF HALALI and PLAINTIFF ARAKANCHI, respectively, as they are the rightful owners of units 817 and 617.

## 1100 WEST'S ATTEMPT TO UNLAWFULLY PURCHASE THE UNITS

69. Upon information and belief, 1100 INVESTMENTS has instructed 1100 CONDO to assist with having 1100 UNITS purchase units 817 and 617.  Although 1100 INVESTMENTS lost its right to purchase 817 and 617, that it is now trying to have 1100 UNITS purchase the units is troubling.

70. For regardless of 1100 INVESTMENTS' purported right to purchase, 1100 UNITS clearly has no right to purchase the units.

## THE UNITS SHOULD BE SOLD TO PLAINTIFFS

71. As a consequence of 1100 INVESTMENTS' and 1100 CONDO's actions, CIRILLINO is currently refusing to sell unit 817 to PLAINTIFF HALALI.  As CIRILLINO and PLAINTIFF HALALI have a valid contract for the sale of unit 817, CIRILLINO is required to sell the unit as contracted.  Its refusal to sell has damaged PLAINTIFF HALALI.

72. As a consequence of 1100 INVESTMENTS' and 1100 CONDO's actions, SHALAD is currently refusing to sell unit 617 to PLAINTIFF ARAKANCHI.  As SHALAD and PLAINTIFF ARAKANCHI I have a valid contract for the sale of unit 817, SHALAD is required to sell the unit as contracted.  Its refusal to sell has damaged PLAINTIFF ARAKANCHI.

73. As a result of all DEFENDANTS' conduct, PLAINTIFFS have been damaged. PLAINTIFFS have retained MORAN LAW FIRM, P.A. to represent them in this matter, and have agreed to pay them a reasonable fee for their services.

## COUNT I – TORTIOUS INTERFERENCE WITH A CONTRACT
### (PLAINTIFF HALALI against 1100 INVESTMENTS)

74. PLAINTIFF HALALI incorporates and realleges herein allegations 1-73 from above.

75. PLAINTIFF HALALI had a contract with CIRILLINO to purchase unit 817 in the Mondrian. **Exhibit "1"**.

76. 1100 INVESTMENTS was aware of this of contract.

77. 1100 INVESTMENTS intentionally and unjustifiably interfered with this contract by attempting to exercise a right to purchase unit 817, despite knowing full well that it had no right to purchase the unit.

78. 1100 INVESTMENTS actions have prevented PLAINTIFF HALALI's purchase of 817, and PLAINTIFF HALALI has therefore been damaged. In addition, from being prevented to purchase the unit, PLAINTIFF HALALI has also been damaged by, including but not limited to, expending various funds in traveling for the sale and inspection of the property, paying various fees related to the contract, placing $55,000 in escrow, lost rental income, and more.

WHEREFORE, PLAINTIFF HALALI demands judgment against 1100 INVESTMENTS for all damages resulting from its tortious interference, which includes but is not limited to actual damages, consequential damages, compensatory damages, attorney's fees and costs, rent earned from renting unit 817 from after when PLAINTIFF HALALI should have owned the unit, prejudgment and post judgment interest, and all other relief the Court deems just and proper.

### COUNT II – TORTIOUS INTERFERENCE WITH A CONTRACT
### (PLAINTIFF ARAKANCHI against 1100 INVESTMENTS)

79. PLAINTIFF ARAKANCHI incorporates and realleges herein allegations 1-73 from above.

80. PLAINTIFF ARAKANCHI had a contract with SHALAD to purchase unit 617 in the Mondrian. **Exhibit "2"**.

81.     1100 INVESTMENTS was aware of this of contract.

82.     1100 INVESTMENTS intentionally and unjustifiably interfered with this contract by attempting to exercise a right to purchase unit 617, despite knowing full well that it had no right to purchase the unit.

83.     1100 INVESTMENTS actions have prevented PLAINTIFF ARAKANCHI's purchase of 617, and PLAINTIFF ARAKANCHI has therefore been damaged.  In addition, from being prevented to purchase the unit, PLAINTIFF ARAKANCHI has also been damaged by, including but not limited to, expending various funds in traveling for the sale and inspection of the property, paying various fees related to the contract, placing $55,000 in escrow, lost rental income and more.

WHEREFORE, PLAINTIFF ARAKANCHI demands judgment against 1100 INVESTMENTS for all damages resulting from its tortious interference, which includes but is not limited to actual damages, consequential damages, compensatory damages, attorney's fees and costs, rent earned from renting unit 617 from after when PLAINTIFF ARAKANCHI should have owned the unit prejudgment and post judgment interest, and all other relief the Court deems just and proper.

### COUNT III – TORTIOUS INTERFERENCE WITH A CONTRACT
### (IN THE ALTERNATIVE)
### (PLAINTIFF HALALI against 1100 CONDO)

84.     PLAINTIFF HALALI incorporates and realleges herein allegations 1-73 from above.  This claim is made to the extent the Declaration of Condominium's certified mail requirement is found enforceable.

85. PLAINTIFF HALALI had a contract with CIRILLINO to purchase unit 817 in the Mondrian. **Exhibit "1"**.

86. 1100 CONDO was aware of this of contract.

87. 1100 CONDO intentionally and unjustifiably interfered with this contract by failing to provide notice of the pending sale of unit 817 in accordance with the Declaration of Condominium. Based on 1100 CONDO's actions, it assumed responsibility for providing such notice, as evidenced by its communications referenced herein.

88. 1100 CONDO's actions have prevented PLAINTIFF HALALI's purchase of 817, and PLAINTIFF HALALI has therefore been damaged. In addition, from being prevented to purchase the unit, PLAINTIFF HALALI has also been damaged by, including but not limited to, expending various funds in traveling for the sale and inspection of the property, paying various fees related to the contract, placing $55,000 in escrow, lost rental income, and more.

WHEREFORE, PLAINTIFF HALALI demands judgment against 1100 CONDO for all damages resulting from its tortious interference, which includes but is not limited to actual damages, consequential damages, compensatory damages, attorney's fees and costs, rent earned from renting unit 817 from after when PLAINTIFF HALALI should have owned the unit, prejudgment and post judgment interest, and all other relief the Court deems just and proper.

### COUNT IV – TORTIOUS INTERFERENCE WITH A CONTRACT
### (IN THE ALTERNATIVE)
### (PLAINTIFF ARAKANCHI against 1100 CONDO)

89. PLAINTIFF ARAKANCHI incorporates and realleges herein allegations 1-73 from above. This claim is made to the extent the Declaration of Condominium's certified mail requirement is found enforceable.

90. PLAINTIFF ARAKANCHI had a contract with SHALAD to purchase unit 617 in the Mondrian.  **Exhibit "1"**.

91. 1100 CONDO was aware of this of contract.

92. 1100 CONDO intentionally and unjustifiably interfered with this contract by failing to provide notice of the pending sale of unit 617 in accordance with the Declaration of Condominium.  Based on 1100 CONDO's actions, it assumed responsibility for providing such notice, as evidenced by its communications referenced herein.

93. 1100 CONDO's actions have prevented PLAINTIFF ARAKANCHI's purchase of 617, and PLAINTIFF HALALI has therefore been damaged.  In addition, from being prevented to purchase the unit, ARAKANCHI has also been damaged by, including but not limited to, expending various funds in traveling for the sale and inspection of the property, paying various fees related to the contract, placing $55,000 in escrow, lost rental income, and more.

WHEREFORE, PLAINTIFF ARAKANCHI demands judgment against 1100 CONDO for all damages resulting from its tortious interference, which includes but is not limited to actual damages, consequential damages, compensatory damages, attorney's fees and costs, rent earned from renting unit 617 from after when PLAINTIFF ARAKANCHI should have owned the unit prejudgment and post judgment interest, and all other relief the Court deems just and proper.

### COUNT V – SPECIFIC PERFORMANCE
### (PLAINTIFF HALALI against CIRILLINO)

94. PLAINTIFF HALALI incorporates and realleges herein allegations 1-73 from above.

95. This is an action for specific performance of a contract to convey real property in Miami-Dade County, Florida.

96. On or about December 15, 2020 PLAINTIFF HALALI and CIRILLINO entered into a written contract for the purchase of real property. *See* **Exhibit "1"**. Any and all addendums and supplements to the contract are incorporated herein.

97. PLAINTIFF HALALI tendered the purchase price to CIRILLINO and requested a conveyance of the real property described in the contract.

98. CIRILLINO refused to accept the tender or to make the conveyance.

99. PLAINTIFF HALALI offers to pay the purchase price.

100. PLAINTIFF HALALI has been damaged by CIRILLINO's actions.

WHEREFORE, PLAINTIFF HALALI demands judgment that CIRILLINO be required to perform the contract for damages.

### COUNT VI – SPECIFIC PERFORMANCE
### (PLAINTIFF ARAKANCHI against SHALAD)

101. PLAINTIFF SHALAD incorporates and realleges herein allegations 1-73 from above.

102. This is an action for specific performance of a contract to convey real property in Miami-Dade County, Florida.

103. On or about December 15, 2020 PLAINTIFF ARAKANCHI and SHALAD entered into a written contract for the purchase of real property. *See* **Exhibit "2"**. Any and all addendums and supplements to the contract are incorporated herein.

104. PLAINTIFF ARAKANCHI tendered the purchase price to SHALAD and requested a conveyance of the real property described in the contract.

105. SHALAD refused to accept the tender or to make the conveyance.

106. PLAINTIFF ARAKANCHI offers to pay the purchase price.

107.	PLAINTIFF ARAKANCHI has been damaged by SHALAD's actions.

WHEREFORE, PLAINTIFF HALALI demands judgment that SHALAD be required to perform the contract for damages.

### JURY DEMAND

PLAINTIFFS hereby demand a jury trial on issues so triable.

### RESERVATION OF RIGHTS

PLAINTIFFS reserve all rights to amend and/or supplement this pleading.


Dated:  February 18, 2021

> /s/Joshua K. Moran
> Joshua K. Moran, Esquire
> Fla. Bar No.: 99061
> JM@JMFLLaw.com
> MORAN LAW FIRM, P.A.
> 2645 Executive Park Drive
> Suite 629
> Weston, Florida 33331
> (954) 275-3718